FILED
RICHARD W. NAGEL
CLERK OF COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* LORI IAFRATE<br>152 Joseph Blvd.<br>Weirton, WV 26062<br><br>and<br><br>MICHELLE HOWARD<br>193 Highland Park<br>Bloomingdale, OH 43910<br>and<br><br>TAMMY R. BROWN<br>257 Harmony Dr.<br>Wintersville, OH 43953,<br><br>Relators,<br><br>v.<br><br>CONTINUING HEALTHCARE SOLUTIONS, INC.<br>c/o Benjamin J. Parsons, Agent<br>5990 Venture Dr, Suite A<br>Dublin, OH 43017,<br><br>and<br><br>SIENNA SKILLED NURSING & REHABILITATION, INC.<br>c/o Benjamin J. Parsons, Agent<br>5990 Venture Dr, Suite A<br>Dublin, OH 43017,<br><br>Respondents. | : | Case No.: 2:22 CV 287<br><br>Judge Judge Sargus<br>MAGISTRATE JUDGE VASCURA<br><br>**<u>QUI TAM COMPLAINT WITH JURY DEMAND</u>**<br><br>**<u>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) AND LOCAL RULE 3.2</u>**<br><br>**<u>DO NOT SERVE</u>** |

**COMPLAINT**
**WITH JURY DEMAND**

Now come *qui tam* Relators Lori Iafrate, Michelle Howard, and Tammy R. Brown, who bring this *qui tam* action in the name of the United States of America (the "Government"), by and through counsel, and for their Complaint against Respondents Continuing Healthcare Solutions, Inc. ("CHS") and Sienna Skilled Nursing & Rehabilitation, Inc. ("Sienna"), upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, state and allege as follows:

**STATEMENT OF CLAIM**

1. Respondents perpetrated a widespread, systematic and ongoing scheme to defraud the Government by knowingly causing Medicare to pay millions of dollars in false claims for nursing facility services by knowingly submitting Medicare claims without obtaining the required certification or recertification of the services by physicians involved in the beneficiaries' care needed to confirm that skilled nursing facility care is required ("Certifications").

2. Relators uncovered this fraud when they discovered a binder full of blank certification and recertification forms with photocopied physician signatures and reported it to the managers and supervisors of CHS, including its Chief Operating Officer, who, when confronted about the fraudulent practice, laughed and said it did not surprise him.

3. The required physician certification of therapy plans of care for Medicare Part B outpatient therapy services were also not signed by physicians and instead were either forged or signed by a nurse.

4. Respondents also engaged in a pattern of changing MDS reports in order to increase reimbursements.

5. Respondents intentionally concealed their fraud from the Government and ultimately terminated Relators for raising concerns about Respondents' fraudulent practices.

6. By failing to engage physicians to confirm the medical necessity of skilled nursing care provided to Medicare beneficiaries, Respondents' fraud has cost the Government and taxpayers millions of dollars annually.

7. Therefore, Relators bring this action to recover damages, treble damages, and civil penalties on behalf of the Government arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Respondents and/or their agents and employees, which resulted in numerous false claims to the Medicare program in violation of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.*, (the "FCA"). Further, Relators seek to recover damages and/or injunctive relief arising from Respondents' wrongful termination of their employment in violation of 31 U.S.C. § 3730(h).

## PARTIES

8. Ms. Iafrate, whose home address is 152 Joseph Blvd., Weirton, WV 26062 , is a licensed Nursing Home Administrator with twenty (20) years of experience and a bachelor's degree. Ms. Iafrate was employed by Respondents for almost one (1) year, and served as the Administrator of Sienna. Ms. Iafrate uncovered Respondents' fraud, and promptly reported the same to the COO of CHS, among others.

9. Mrs. Brown, whose home address is 257 Harmony Dr., Wintersville, Ohio 43953, was a Social Service Director for eight (8) years, and earned an Associate's Degree in Psychology. Mrs. Brown was employed by Respondents for almost six (6) years, through

May 4, 2021. Mrs. Brown shared an office with the Minimum Data Set ("MDS") Nurse at Sienna, witnessed the fraud, and was present when the fraud was first exposed.

10. Ms. Howard, whose home address is 139 Highland Park, Bloomingdale, OH 43910, worked in admissions, marketing, and social services, including as the Admissions Marketing Director. Ms. Howard was employed by Respondents for thirteen (13) years, through May 2021. Ms. Howard was a witness to the fraud and was present when the fraud was first exposed.

11. Respondent CHS is an Ohio corporation with an address c/o Benjamin J. Parsons, Agent, 5990 Venture Dr, Suite A, Dublin, OH 43017. CHS is the operator of over thirty (30) skilled nursing and assisted living facilities throughout Ohio, and is the parent of Sienna. Skilled nursing facilities operated by CHS receive millions of dollars in payments annually from Medicare and Medicaid.

12. Respondent Sienna is an Ohio corporation with an address c/o Benjamin J. Parsons, Agent, 5990 Venture Dr, Suite A, Dublin, OH 43017. Sienna owns and operates the skilled nursing facility at 250 Cadiz Road, Wintersville, OH 43953, and is a subsidiary of CHS.

13. CHS and its owners operate a sophisticated and complex post-acute health care delivery network, offering services though different business lines and across multiple levels of the continuum of care. CHS and its owners, Scott Sprenger, Chris Mallett, Mark Sprenger, Jeff Bunner, and Benjamin Parsons, through common ownership or joint ventures, operate numerous ancillary businesses that provide services to nursing facility residents throughout Ohio and across the United States, billing Medicare and Medicaid for their services.

14. CHS owns or shares common ownership with three therapy companies that provide contract therapy services to nursing facilities: CHS Therapy, LLC, dba CHS Therapy & Rehab, Remedy Therapy Services, LLC, dba Remedy Therapy Services, and Adaptive Rehabilitation Services, LLC, dba Adaptive Rehabilitation. Collectively, these therapy companies provide physical therapy, occupational therapy, and speech therapy to hundreds of skilled nursing, assisted living, and independent living facilities throughout the United States. CHS Therapy & Rehab, Remedy Therapy Services, and Adaptive Rehabilitation are all located at 7261 Engle Rd., Suite 200, Middleburg Heights, Ohio 44130, and share the same management team.

15. CHS owns or shares common ownership with CHS Hospice & Palliative Care Services, LLC, dba Buckeye Hospice and Home Care Services ("Buckeye Hospice"). Buckeye Hospice operates out of locations at various CHS skilled nursing facilities.

16. CHS owns or shares common ownership with Valor Ambulance, LLC ("Valor Ambulance"). Valor Ambulance operates out of a CHS skilled nursing facility located in Zanesville, Ohio.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although it is no longer jurisdictional after the 2010 amendments to the FCA, there has been no statutorily relevant public disclosure of the allegations or transactions in this Complaint. Moreover, Relators are the original sources of the information on which the allegations herein are based.

18. Respondents can be found in, reside in, transact and have transacted business in this District, and have sufficient contact with this District generally and, in particular, with respect to the events alleged herein so as to subject them to personal jurisdiction in this Court.

19. Venue is proper in the Southern District of Ohio because many of the fraudulent actions described herein occurred in the Southern District of Ohio, and because Respondents can be found in, reside in, and transact and have transacted business in this District.

## MEDICARE REQUIRES PHYSICIAN CERTIFICATION AS A CONDITION TO PAYMENT

20. Medicare is a third-party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C. §§ 1395 et seq. Physicians, non-physician practitioners, and other health care suppliers must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

21. In order to enter into a Provider Agreement authorizing them to provide services to Medicare beneficiaries, all providers, including providers of skilled nursing services, must submit an enrollment application to the Medicare program on its Form CMS 855A. Among other things, the application requires providers to sign a certification that states in relevant part: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare Enrollment Application, Institutional Providers, Form CMS 855A, Section 15, Paragraph 6.

22. The Medicare program generally relies upon physicians and their expertise to drive care to Medicare beneficiaries and determine which services are medically necessary and appropriate. As such, Medicare has given the physician a "major role" in determining utilization of services furnished by Medicare providers, including skilled nursing facilities. 42 C.F.R. § 424.10.

23. In order to receive reimbursement for services from Medicare, a provider must have a physician certify and recertify that, with respect to skilled nursing facility care: (1) the individual needs skilled nursing care or other skilled rehabilitation services on a daily basis; (2) as a practical matter, the services can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are needed for a condition for which the individual was receiving inpatient hospital services prior to transfer to the skilled nursing facility or for a condition which arose after the transfer and while he was still in the facility for treatment of the condition for which he was receiving such inpatient hospital services. 42 U.S.C. §§ 1395f(a)(2); 42 C.F.R. § 424.5(a)(4). Services that are not reasonable and necessary for the diagnosis or treatment of an individual's illness or injury or to improve the functioning of a malformed body member are not eligible for reimbursement by Medicare. 42 U.S.C. § 1395y(a)(l)(A).

24. In order to confirm that post-hospital skilled nursing facility care is required and appropriate for a Medicare beneficiary, a certification and recertification must be signed by the physician responsible for the case, or, with his or her authorization, by a physician on the SNF staff or a physician who is available in case of an emergency and has knowledge of the case. It is an express condition of payment that the treatment sought under Medicare

must be certified and recertified as medically necessary and signed by a physician with knowledge of the patient's care. 42 C.F.R. § 424.20(e)(1).

25. The purpose of the certification/recertification requirement is essentially to ensure that a physician *pre-approves* the provision of extended care services, and that such services are then provided based upon such approval. Hence, the law specifies required timeframes for certification statements and for initial and subsequent recertification statements, with limited exception. In particular, the federal regulations indicate that the certification statement "must be obtained" at the time of admission or soon as possible thereafter. 42 CFR § 424.20(b). The law further provides that the first recertification statement is required no later than the 14th day of post-hospital skilled nursing facility care, and that subsequent recertification statements are required at least every 30 days after the first recertification. 42 CFR § 424.20(d).

26. Regardless of the form used, an initial certification must contain language indicating or demonstrating that post-hospital skilled nursing facility care is required because:

- The individual needs skilled nursing care or other skilled rehabilitation services on a daily basis;
- As a practical matter, the skilled care can only be provided in the skilled nursing facility on an inpatient basis; and
- The skilled care is needed for a condition for which the individual received inpatient care in the hospital, or for a new condition that arose while the individual was receiving care in the skilled nursing facility for a condition for which he or she received inpatient care in a participating or qualified hospital.

42 CFR § 424.20(a).

27. A recertification must contain language indicating or demonstrating the following contents:

- The reasons for the continued need for extended care services;
- The estimated time the individual will need to remain in the skilled nursing facility;
- Plans for home care, if any; and
- If the circumstances require, identify the fact that continued services are needed for a condition that arose after admission to the skilled nursing facility and while the individual was still under treatment for the condition for which he had received inpatient hospital services.

42 CFR § 424.20(c).

## FEDERAL LAW PROHIBITS FORGERY IN CONNECTION WITH SUBMISSION OF CLAIMS FOR PAYMENT UNDER MEDICARE AND MEDICAID

28. Medicare requires medical practitioners to sign orders, certifications, and recertification statements related to patients' care. These documentation requirements substantiate that the physician has reviewed the patient's condition and has determined that services or supplies are medically necessary. CMS Medicare Program Integrity Manual (Publication 100-08), Chapter 3, Section 3.3.2.4.

29. A condition for the Respondents to receive payment from Medicare is that medical practitioners must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10.

30. There must be a separate statement signed by medical practitioners for each certification and recertification. 42 C.F.R. § 424.11(b).

31. To receive reimbursement from Medicare, Respondents must complete the Minimum Data Set ("MDS") assessment and submit the MDS to CMS. 42 C.F.R. § 483.315. The MDS assessment provides the basis upon which CMS determines the *per diem* reimbursement rate that will be paid for each day of services provided to a Medicare Part A beneficiary in a nursing facility. Based on the medical condition, nursing care needs, and other information provided in the MDS form, each individual is assigned a Patient Driven Payment Model ("PDPM") classification, which determines the Medicare Part A reimbursement rate for that resident.

32. One element of the MDS assessment relates to eligibility of the Medicare Part A beneficiary. If a resident's status does not meet the eligibility requirements for Medicare Part A coverage, providers are not permitted to bill for non-covered days. Eligibility criteria include that the physician has certified and recertified the need for extended care services in the nursing facility. MDS 3.0 RAI Manual, Chapter 6.

33. Individuals at Respondents' nursing facilities who completed MDS assessments signed forms containing the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also

> certify that I am authorized to submit this information by this facility or on its behalf.

34. In addition to completion of the MDS assessment, to obtain payment for services covered by Medicare, providers are required to submit a claim which they must sign. 42 C.F.R. §§ 424.30, 424.33.

35. It is the responsibility of the provider to ensure that claims submitted to Medicare are accurate and meet all Medicare requirements.

36. Skilled nursing facilities submit bills to Medicare via the Medicare Administrative Contractors that process and pay Medicare claims on Form CMS-1450 (the UB-04) or its electronic equivalent. Respondents' nursing facilities submitted UB-04 bills containing the following certification:

> UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CML MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).
> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

37. As a result of the foregoing representations and certifications of compliance made by Respondents' nursing facilities, Respondents received payment from Medicare.

38. If Respondents fail to obtain the required certification or recertification statement, or if a medical practitioner fails to sign an order, Medicare will not reimburse Respondents for the treatment, order, or supplies. Medicare Claims Processing Manual, c. 10, 10.1.

39. Claims for payment supported by validly signed Certifications go to the "essence of the bargain" between Respondents and Medicare.

40. A valid signature from a medical practitioner is what signals to the Government that the services rendered were necessary in the first instance.

41. The misrepresentations by Respondents, in the form of forged signatures on the Certifications, were material to the Government's payment of Respondents' claims.

42. For each and every claim Respondents submitted to Medicare for reimbursement, Respondents certified that appropriate certifications were on file, that the services were rendered for medical necessity, that records adequately describing services were maintained, and that any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal and State Laws.

43. Respondents were aware of, or should have been aware of, the conditions for repayment under Medicare, as set forth above.

44. The FCA provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $11,181 up to $22,363 for each such claim, plus three times the amount of the damages actually sustained by the federal Government. 31 U.S.C. § 3729(a)(1)(A)-(B).

45. The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of said person and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Respondents during that time). Based on these provisions, *qui tam* Relators seek through this action to recover damages and civil penalties arising from the Respondents' knowing fraud on the Government.

**RESPONDENTS SYSTEMATICALLY FORGED CERTIFICATIONS AND SUBMITTED THEM AS THE BASIS FOR PAYMENT OF MILLIONS OF DOLLARS OVER AT LEAST 4 YEARS**

46. From at least 2016 through at least 2019, Respondents fraudulently feigned compliance with applicable federal regulations governing reimbursement for skilled nursing services by forging physicians' signatures on Certifications that certified a need for the services provided by Respondents.

47. These Certifications are the foundation for any and all claims for payments received from Medicare.

48. Instead of obtaining the physicians' signatures on the Certifications, as required, the MDS nurses simply copied the physicians signatures onto blank certification forms.

49. The MDS nurses would then complete the blanks on the pre-signed forms with the patients' information, and date them as needed, and then use these forged Certifications in support of claims ultimately paid by Medicare.

50. These Certifications are required to be signed and dated by a referring physician in order to certify the need for SNF inpatient care, and are required to be recertified on the admission date, no later than 14 days after admission, and every 30 days thereafter.

51. These Certifications were forged as described above.

52. Multiple copies of pre-signed, forged Certifications were maintained in a binder by the MDS nurses, who simply pulled out a forged Certification when needed, instead of obtaining the required signatures from the physicians.

53. One or more of the MDS nurses also physically signed the physician's signature on the certification forms herself.

54. This practice continued from at least 2016 through at least 2019, when Ms. Iafrate confronted CHS's leadership about this widespread and systematic fraud.

55. Three different MDS nurses - Julie Raviseo Mannnarino, Erin Moores, and Kelly Roth – participated in this fraudulent practice.

56. Due to the ongoing nature of the fraud, and the fact it continued under three (3) different nurses, the forgery appears to be a practice and/or policy of CHS, which was part of the training of its MDS nurses.

57. In an attempt to conceal the fraud, and in further violation of applicable law, instead of filing the Certifications with the patients' medical records, they were all kept in the MDS nurse's office.

58. In August 2019, Ms. Iafrate decided to obtain a hard copy of a chart for a specific patient (whose name will be provided separately), in order to inspect the same.

59. When she attempted to obtain the chart from Melissa Alvis, who coordinated the medical records at Sienna, Ms. Iafrate discovered that the facility's medical records were stored in a wooden shed with gasoline and equipment.

60. Ms. Iafrate then asked Ms. Alvis about the Certifications, to which Ms. Alvis responded, "What is a Certification?"

61. Given the shocking discovery that the medical records coordinator was not even aware of the existence or location of these crucial documents, Ms. Iafrate went to the office of Kelly Roth, the MDS nurse, to further inquire about Certifications.

62. Ms. Alvis followed Ms. Iafrate to Ms. Roth's office, which she shared with Relator Brown, who returned to the office at the time and heard Ms. Roth state that she was trained to forge the Certifications.

63. When asked about the location of the Certifications, Ms. Roth indicated that they are all kept in binders – not in the patient charts.

64. Ms. Iafrate then inspected a roughly 2" white binder located on Ms. Roth's desk.

65. Ms. Roth was always very protective of this binder, and kept it close at hand in her office at all times.

66. At the time, Ms. Iafrate witnessed completed forms and noticed that the dates were not in the doctors' handwriting.

67. In response to an inquiry about the dates, Ms. Roth responded that she was unable to obtain signatures from the physicians, and noted that she was trained to photocopy the physicians' signatures on blank forms and later complete the patient information and dates as and when needed.

68. Ms. Iafrate continued to inspect the binder and came to a clear sleeve in the back.

69. In this sleeve were blank forms that had photocopies of physicians' signatures on them, with signatures in each spot to fill out the full one hundred (100) days of certifications and re-certifications on the form used by CHS and Sienna for the Certifications. A representative example of the type of form at issue is attached hereto as Exhibit "A."

70. When confronted with the impropriety of this practice, Ms. Roth admitted to the forgeries, and explained that she completed the information on the pre-signed, forged forms, and then dated them as patients were admitted, and periodically thereafter as required in the certification process.

71. Mrs. Brown was in the office and observed the exchange between Ms. Iafrate and Ms. Roth.

72. Relator Howard also walked into the office during this exchange and observed a significant portion of it.

73. Later on the same day as Ms. Iafrate's discovery of the fraud, Ms. Iafrate reported the practice to CHS's COO Mark Morley who, in response, laughed and said that he was not surprised by this widespread, ongoing practice, and mentioned that he would discuss the issue with CHS's corporate MDS nurse, Ruth Burrier.

74. This further suggests that the practice was employed across all of CHS's dozens of skilled nursing facilities, and potentially its other service lines, as well.

75. Later that week, Ms. Iafrate raised the issue with Dr. Figel's nurse practitioner, Ms. Trimmer, who said she was not even aware of the Certifications.

76. Dr. Figel was responsible for approximately 80% of admissions into skilled nursing at Sienna, yet his nurse practitioner who commonly signed orders on his behalf and was his primary representative at Sienna, was unaware of the Certifications for which his office was responsible.

77. The following week, Ms. Iafrate raised the issue with Respondents' corporate clinical nurse Patty Dimmerling when Ms. Dimmerling visited Sienna.

78. Ms. Iafrate took the binder from Ms. Roth's office and Ms. Roth followed Ms. Iafrate to the conference room, where Ms. Iafrate showed the binder with the blank, pre-signed, photocopied Certifications to Ms. Dimmerling who briefly looked at the forms, covered her ears with her hands – indicating she did not want to hear about the issue, and noted that she did not want to address the issue.

79. Instead, Ms. Dimmerling indicated that she would pass the information about the ongoing fraud on to the corporate MDS team, and that Ms. Burrier, the corporate MDS nurse, would need to provide re-education.

80. Ms. Dimmerling included that she discussed the issue with the Certifications with Ms. Burrier (and that Ms. Burrier would provide re-education) in her visit report, which was emailed to Carrie Horst (VP of Clinical Services), Ms. Iafrate, and Mr. Morley in August 2019.

81. In April 2020, Ms. Iafrate's employment at Sienna terminated as a result of Respondents' retaliation for her efforts to report and remedy the violations of the FCA.

82. In April 2020, after Ms. Iafrate was gone, Ms. Burrier visited the office shared by Ms. Roth and Mrs. Brown.

83. Ms. Burrier faced Ms. Roth and told her not to sign or date the Certifications any longer.

84. She instructed Ms. Roth to have the physicians sign and date the Certifications and fax them to the facility.

85. Prior to this instruction from Ms. Burrier, Mrs. Brown never heard or observed any MDS nurse at Sienna discussing actually obtaining signatures from the physicians.

86. After this instruction from Ms. Burrier, the practice changed with respect to the Certifications and, for the first time, Mrs. Brown and Ms. Howard observed that Certifications were being faxed from physicians' offices and directed to the MDS nurse.

87. This fraudulent forging of the Certifications was systematic at Sienna and, it appears, across all of CHS's facilities.

88. As a result, of the practice, policy, and procedures described above with respect to forged Certifications, Respondents falsely stated to the Government and State that their services rendered to skilled care patients from at least 2016 through at least 2019 were supported by the required physician-signed Certification.

89. The facility housed approximately 18-20 skilled care patients at any given time.

90. As the Administrator, Ms. Iafrate oversaw billing and has personal knowledge of the practices and claims actually submitted to the government.

91. For skilled residents, the facility would hold a triple check to make sure that what was in the billing software matched the claims, which Ms. Iafrate sometimes attended. Once this process was completed corporate would release the claim.

92. All of these claims were submitted based on forged Certifications from at least 2016 through at least 2019.

93. As a result of Respondents' false statements, they wrongfully obtained reimbursement for health care services provided for their skilled care patients from at least 2016 through at least 2019.

94. Medicare would not have remitted payment to the Respondents had they known the signatures and dates on the Certifications were forged.

95. Respondents have not reported any conduct alleged in this present action to the Office of Inspector General ("OIG") of the United States Department of Health and Human Services Self-Disclosure Protocol.

96. Respondents are required to disclose all known errors and omissions in its claims for reimbursement from Medicare and Medicaid. 42 U.S.C. § 1320(a)-7b(a)(3) specifically

creates a duty to disclose known errors in requests for reimbursement from Medicare and Medicaid.

97. By forging physician signatures on Certifications, Respondents submitted false or fraudulent claims to the Government.

98. By forging physician signatures on Certifications, Respondents failed to substantiate or authenticate that a physician reviewed the patient's condition and has determined that services or supplies were medically necessary.

**RESPONDENTS ENGAGED IN OTHER WRONGDOING IN ORDER TO SUBMIT FALSE CLAIMS**

99. Respondents pressured their employees to code patients at the worst condition and most assistance required on the MDS reports.

100. Respondents pressured their employees to complete MDS assessments in a manner that increased the reimbursements instead of reflecting the actual health of the patients.

101. Mrs. Brown attempted to code the patients accurately.

102. Mrs. Brown returned from an absence from the facility in June 2020 and discovered that while she was gone Kelly Roth, Respondents' MDS Coordinator, changed the MDS reports, in order to increase reimbursements, to reflect that the patients were more depressed than Mrs. Brown had coded them based on her observations.. These reports were then the basis of false claims submitted to the Government for payment or approval.

**COUNT I**
**FALSE CLAIMS ACT VIOLATIONS**
**(Knowingly Presenting a False or Fraudulent Record)**

103. Relators incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

104. By virtue of the acts described above, Respondents knowingly presented, or caused to be presented, false or fraudulent claims to the Government for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(A).

105. By virtue of the false or fraudulent claims for payment caused to be made by Respondents, the Government suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT II
## FALSE CLAIMS ACT VIOLATIONS
## (False Record to Avoid an Obligation to Refund)

106. Relators incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

107. By virtue of the acts described above, Respondents knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

108. By virtue of the false records or false statements caused to be made by Respondents, the Government suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT III
## FALSE CLAIMS ACT VIOLATIONS
## (Retaliation)

109. Relators incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

110. The violations that Relators witnessed and reported included violations of the FCA.

111. Each Relator's activity was protected activity.

112. Respondents knew of Relators' activity as alleged above.

113. Ultimately, each Relator's employment terminated as a result of retaliation for their efforts to report and remedy the violations of the FCA.

114. Under 31 U.S.C. § 3730(h), there is a specific cause of action for employees disciplined or discharged for their efforts to halt violations of the FCA.

115. Relators' reporting of violations to their superiors and other related efforts were in order to halt violations of the FCA.

116. After the reporting of the violations of the FCA, Relators experienced working conditions so difficult or unpleasant that a reasonable person in their shoes would have felt compelled to resign.

117. As a direct and proximate result of her unlawful constructive discharge, each Relator suffered financial loss in wages, bonuses and benefits in an amount to be proven at trial.

118. Under 31 U.S.C. § 3730(h), each Relator is entitled to two (2) times back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation including, without limitation, litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relators prays for judgment in favor of the Government against the Respondents for treble damages under the FCA, to be determined at trial, plus civil penalties for each violation, plus the full cost of pursuing this action inclusive of attorney fees, court costs and service fees, plus post-judgment interest and other such relief as the

Court may deem just and proper and, in addition, each Relator prays that she be awarded the maximum amount allowable pursuant to 31 U.S.C. § 3730(h).

**JURY DEMAND**

Relators demand a trial to a jury on all issues so triable.

**SERVICE**

Relators served a copy of this Complaint on the Government via certified mail (on the following: Civil Process Clerk, U.S. Attorney for the Southern District of Ohio, U.S. Attorney's Office, 303 Marconi Boulevard, Suite 200, Columbus, OH 43215 and Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001) on or before the date of filing as required by 31 U.S.C. § 3730(b)(2), and will serve a disclosure statement promptly after this filing.

Respectfully submitted,

Robert Huff Miller (0076939)
ROBERT HUFF MILLER LLC
100 East Broad Street
Columbus, OH 43215
Telephone: 614.384.5794
Facsimile: 614.441.9280
Email: rob@roberthuffmiller.com

*Counsel for Relators*

EXHIBIT A

Form 888/2 (if 2-part set) or Form 888/3 (if 3-part set)

# CERTIFICATION AND RECERTIFICATION

**(Skilled Nursing Facility)**

__________ (PATIENT) __________ (ADMISSION DATE) __________ (HEALTH INSURANCE CLAIM NUMBER)

**CERTIFICATION** of patient admission. Required at time of admission.

I certify that SNF services are required to be given on an inpatient basis because of the above named patient's need for skilled nursing care on a continuing basis for the condition(s) for which he/she was receiving inpatient hospital services prior to his/her transfer to the SNF.

__________ (PHYSICIAN) __________ (TIME & DATE)

**RECERTIFICATION** of continued SNF inpatient care. **On or before the 14th day.**

(Due no later than 14 days from Admission date)

Date Due__________

I certify that continued SNF inpatient care is necessary for the following reason(s):

I estimate that the additional period of SNF inpatient care will be ______ days (or ______ weeks).

Plans for post-SNF care are: ☐ Home Health Agency ☐ Office Care ☐ Other __________

Continued SNF care is for same condition(s) for which patient received inpatient hospital services: ☐ Yes ☐ No

__________ (PHYSICIAN) __________ (DATE)

**RECERTIFICATION** of continued SNF inpatient care.

Due no later than 30 days from the previous recertification signature date

Date Due__________

I certify that continued SNF inpatient care is necessary for the following reason(s):

I estimate that the additional period of SNF inpatient care will be ______ days (or ______ weeks).

Plans for post-SNF care are: ☐ Home Health Agency ☐ Office Care ☐ Other __________

Continued SNF care is for same condition(s) for which patient received inpatient hospital services: ☐ Yes ☐ No

__________ (PHYSICIAN) __________ (DATE)

**RECERTIFICATION** of continued SNF inpatient care.

Due no later than 30 days from the previous recertification signature date

Date Due__________

I certify that continued SNF inpatient care is necessary for the following reason(s):

I estimate that the additional period of SNF inpatient care will be ______ days (or ______ weeks).

Plans for post-SNF care are: ☐ Home Health Agency ☐ Office Care ☐ Other __________

Continued SNF care is for same condition(s) for which patient received inpatient hospital services: ☐ Yes ☐ No

__________ (PHYSICIAN) __________ (DATE)

AMBULANCE SERVICE

I hereby certify that ambulance service was medically necessary for the above named patient.

__________ (PHYSICIAN) __________ (DATE)

Form 888 Rev. 10/14 © BRIGGS, Des Moines, IA (800) 247-2343
Unauthorized copying or use violates copyright law. www.BriggsCorp.com PRINTED IN U.S.A.

BRIGGS Healthcare